After a drunk driving crash, Charles Krause was charged in federal court with two separate offenses. This appeal presents two issues as to the one count that was left at the time the case went to the jury, and that offense was willful destruction of government property under 18 U.S.C. section 1361. The two issues presented today are whether the district court erred in not instructing the jury on an element of 1361 which would have required that the government prove that the defendant knew the destroyed property was the property of the government. And the second issue is whether the evidence was sufficient on that remaining count, 1361, that was left. Now the defense, the appellant's position is that regardless of how this court rules on the jury instruction issue, that the evidence was insufficient to support the conviction. And so I'd like to focus on the evidence that actually was presented at trial to show that there wasn't sufficient evidence to support the 1361 conviction. Just to set the scene, this was the kind of trial that relied a lot on a post-accident presentation of the evidence. There was a police officer that testified that in September of 2014, he came across a completely destroyed car in a cornfield in Lakeville, Minnesota. And that the damage to the car was so severe, he was concerned that the driver or a passenger had been killed or injured. The police officer came across the appellant in this case, Charles Krause, when he came to the scene with a tow truck to have his vehicle towed. The officer saw, five to six hours after the crash, clear signs of intoxication. A portable breath test showed a .04 BAC, which was half the legal limit to drive. The officer saw signs of intoxication, such as slurred speech and bloodshot eyes. And then Mr. Krause was interviewed by that officer. At trial, the defense sought and received an instruction that this willfulness argument, that this case that required proof of willful damage of government property, that Mr. Krause, if he could show he did not form the intent of voluntary intoxication defense, that the jury should find him not guilty. And so the crux of the defense evidence at trial about to prove that intoxication defense was the testimony of a toxicologist who testified by extrapolating backward that at the very least, Mr. Krause's blood alcohol content at the time of the crash was four times the legal limit to drive in Minnesota, .25. And the evidence showed that the government got the benefit of the doubt, that that extrapolation could possibly have shown a much higher blood alcohol content. So we start with the idea that willful damage to government property in the middle of the night, in the dark, on a runway in Lakeville was supported, the defense was supported by signs of severe intoxication. Now it wasn't just the intoxication defense that was present, there was a lot of corroborating evidence about the defendant's actions that evening and about what happened the next morning and about people that actually saw him visibly intoxicated. There was the testimony of a woman that saw him in a bar the night before, that his head was slumped, that he was so intoxicated that she thought he was drunk and that he would But counsel, you know, you're highlighting the evidence and I understand why. You're highlighting the evidence that shows intoxication. I think there was intoxication, there's no question about that. But then you, the question is whether he could have formed the intent and here you have a, the jury was instructed on voluntary intoxication, so we don't have a legal issue on that point. But we do have evidence that even though he was drunk, I mean really drunk, he did some things that show some rationality. He called his mom and waved her down with his cell phone and had the presence of mind to know exactly where he crashed the next morning and go back to the scene. And so, I guess my question for you is, didn't the jury have enough, I mean it's circumstantial to be sure, but didn't they have enough to reach the conclusion that he could have formed the intent the night before based on these rational actions that happened around the time of the crash? I believe that, Your Honor, you're correctly characterizing the government's argument about, as you say, rational actions, about what he was capable of doing following the crash. But at the same time, the same sort of intoxication evidence about how he was behaving, his mother's evidence about him passing out consistently when she was driving him home. About his ability to make the phone call to her, maybe evidence of being able to take willful acts, to be able to do the things to get himself home, but I think that's a wholly separate calculus than the willful desire to damage government property. And I guess, let me just say this. You're correct that all those actions happened, but when they're combined with the objective evidence at the scene about how the crash occurred, this runway had straight, and I will say this, the parties disputed the exact same facts and cast them differently in front of the jury and they were arguing it, but the argument that the defense made was that those straight tracks off of the end of the runway after crashing through the antenna array continued straight. And the car flipping over and crashing into the cornfield was objective evidence that at the time the crash happened, which is more important than what happened after the phone call was made in the evening, because the intent at the time of the crash matters, showed that he was so intoxicated. He actually just didn't know what he had hit, because- Was he wanted to, he thought it'd be cool to drive as fast as he could down the runway and he just ended up hitting an antenna. That he wasn't necessarily aiming for the antenna, but he just got really drunk and thought it'd be fun to drive fast. But wasn't it a jury call? I mean, there was enough evidence then to sort of figure out, there was enough contemporaneous evidence from afterwards to say, well, he could have formed that intent. Maybe he wanted, he was mad at the government, he was mad at something at the Lakeville airport. He wanted to hit the antenna, he wanted to do some damage. Isn't there enough there to make that a jury call? I think the answer is no, Your Honor, and here's why. You're correct. Well, let me back up and say that the theory that you just put out there was a theory that actually showed up at trial. Because one of the government's witnesses had written an email that said, after inspecting it, he was an FAA person. That it sure looked like someone had gone on a joy ride or a speed cruise on the runway. The answer to your question about, wasn't there enough for the jury? Is that if the evidence points both ways equally, and I think that it did. That is not proof beyond a reasonable doubt. It's persuasion, the jury has to be persuaded, but there's still a legal standard in place that's supported by the Constitution that it has to be proof beyond a reasonable doubt. And what I think the trial record, which I think the parties have done a good job translating into the appellate record, is that there was so much evidence on both sides, and when there's an intoxication defense that was perfected and put into evidence, at best the jury had two competing stories, one never rising over the other. And in a sufficiency of the evidence argument, it has to still be proof beyond a reasonable doubt. And when that's combined with the, I guess, the sort of tapestry of other evidence that was included, which included the defendant's own testimony. His own testimony about his intent, and granted, his memory was not good because of the blackout drunk state that he was in. And the lack of motive, I mean, that's probably the most important thing here, is this kind of damage. Because there was a self-interest in keeping the car that he had mortgaged or he had a loan on with his father in good condition. He had an entire flight career that went down the drain. When it's combined with the lack of a motive to do it, there was no evidence put forward that he had any problems in flight school. There was no evidence put forward that he had any issues with the FAA or the Lakeville Airport. He admitted that he'd done touch and goes there. And I'll just, as a side note, there was this potential theory that he was somebody who had committed mischief at the airport. But that was debunked by the FBI agent who followed up and did some things. When all of those things are combined with a lack of motive, certainly the jury has the right to try to sort out these two competing theories. But when they match equivalently in quantum, that is not proof beyond a reasonable doubt. How about this evidence, and maybe an argument could be made that it tips that equilibrium that you're describing? Sure. And that is, why couldn't the jury take into account that this is someone with aviation training, is knowledgeable about things that exist at airports and around runways, and couple that with the fact that this was not a situation where a vehicle simply veers off of a highway, for example, and strikes this equipment? But as I understand it, the evidence was he had to go past a gate or past a fence, across a field, onto the runway, drive down the runway, and then squarely hit this array. Why doesn't that constitute very plausible and significant evidence that indicates the state of mind? For two reasons, Your Honor. One is that getting to the airfield, the willful actions of getting to the airfield, are just as consistent with somebody going on a joyride, as Judge Strass indicated. The speeding on the runway, it's a long, flat space. And to access the runway, I think, is a different thing than willful intent to damage the array. And the second part I would indicate is that evidence came out at trial from the flight from Mr. Nauer, the flight training instructor, that it's not, and Mr. Krause's testimony himself, pilots, their job isn't to understand how functional the equipment is and exactly where it's placed at each airport. His job is to fly using the instruments and the array itself. And I would also point to the fact that, again, the tire tracks go well through that array. There appears to be no attempt to stop, and then a life-threatening injury. Those are not the actions of someone trying to destroy something and get away with it. Those are the actions of someone who doesn't understand what he hit and nearly kills himself in a drunk driving accident afterward. What about his own testimony? You've referred to that, and as I understand it, he admitted to lying to the investigators regarding what happened. Is that another factor that a jury, if you're just talking about credibility, and they see him admitting to kind of trying to cover it up? Absolutely. But I'll step forward and say the quantum of evidence is balanced again because he is clearly afraid of getting a DUI or possibly a state charge of damaging government property. But a DUI is something that is just as concerning in terms of criminal liability for him as anything else. And something that he, at that point, it's what's on his mind because he knows he's been drinking. And he knows there's a vehicle in the field that's registered to him. And so the cover up, and I admit that he admitted on cross-examination that he lied. That is just as indicative of being afraid of legal consequences separate from this charge as it is from anything else. And doesn't retroactively change what his intent was. The point is, in balancing the evidence, that's not proof beyond a reasonable doubt from a quantum point of view. I see that I'm well into my rebuttal time and I will- Counsel, one thing to think about in rebuttal is addressing the legal argument as well, the statutory interpretation issue. Because I think that's a very interesting issue. Thank you, Your Honor. Mr. Daugherty. Good morning. May it please the court, counsel. My name is John Daugherty. I'm an assistant US attorney here in the District of Minnesota. I prosecuted this case at trial. And it's my privilege to represent the United States here this morning. I will begin with the issue that Judge Strass finds interesting, which is the issue of statutory interpretation. Your Honors, it is simply not an element of the crime of destroying government property that the defendant know that the property he destroyed was owned by the United States. And this court, in the Bangert case, the only authority relied upon by defendant for his claim, did not add that element to the elements of a 1361 case. This should be a fairly straightforward issue. It is a question of statutory interpretation, as Judge Strass pointed out. And so we begin with the plain text of the statute itself. And 18 USC 1361 simply doesn't say anything about the defendant needing to know that the destroyed property is property of the government of the United States. Counsel, on the plain language argument, there's a canon, a long standing criminal law canon. This brings me back to my days of teaching criminal law. That when you have a mens rea at the beginning, that sometimes you carry it through the entire statute to each of the elements. Particularly when a particular element would separate the legality from the non-legal act. And it's a little bit of a bizarre instruction that was given on willfully, because it says you do it voluntarily and intentionally with knowledge. And if you pull willfully through, you can make a colorable argument that knowledge, the knowledge part of that instruction, attaches to property of the United States. I'm wondering what the United States' response is to that. I respectfully disagree with that. I understand the canon of construction. I understand the point you're making. However, the willfully was defined by Judge Kyle in jury instruction number seven. As you say, voluntarily and with knowledge. And that means from the context of the other instructions, with knowledge that one's behavior is violating the law. And the case that we relied upon, or that we brought to Judge Kyle's attention a lot on that point, was a Seventh Circuit case, United States versus Urpher. Where it talks about, under what circumstances can one assume that a person knows they are violating the law? And under what circumstances do we need to impart knowledge? Because knowledge is necessary to separate innocent from criminal conduct. The Seventh Circuit in the Urpher case, which also involved, ironically, the destruction of government radio antenna arrays, different kinds for different uses, said that it's obvious that destroying property that doesn't belong to you violates the law. You don't need to cite the title and the section of the law that you're violating. But it is, I believe the word was mala in se, to use some Latin. And that is the knowledge that I believe goes in response to your question. Right, and that supports your argument, because the fact of the matter is intentionally destroying someone else's property, whether it's US government property or not, is mala in se. And so your argument would be, you don't need to know it's United States property under the instruction given. That is correct, and I would also add that Bangert does not change the landscape on that. Bangert does talk about, Bangert's, in the defendant, Bangert's knowledge that the flag that he burned was property of the United States. But that is in the context of a very fact-specific and fact-intensive analysis of the sufficiency of the evidence on the point of willfulness. Bangert's testimony, which starts I think about page 1302 of the opinion, was that he had gone to this demonstration against US policy towards Iran on the campus of Washington University. That someone else there had taken a flag out of a plastic bag, and that yes, he had participated in burning it. It didn't say so explicitly in the opinion, but that testimony is amenable to the construction that Bangert thought he was burning a flag with the consent of its owner. And that, of course, would not be against the law. And therefore, would not be willful under the way that I believe that willful ought to be used in this context. And so it was important to show that Bangert had in fact participated in taking a flag down from a federal building at 1520 Market Street in St. Louis. Ironically, a block or so from the Eagleton Courthouse, and that there were three witnesses who had seen him do it. And that therefore, he knew that this was not a flag that was being burned with the consent of the owner, because he knew it was a flag that was the property of the United States. And I also think that in Bangert, it is interesting what this court did, which was affirm the conviction. If Bangert is saying that knowledge of ownership is an element of the crime, we know because in the 28J, we provided the court with the indictment and with the jury instructions from Bangert. So we know that that jury was not instructed on this element. If this court had found, as the defense, I think, position is, that Bangert found knowledge of ownership to be an element. And if the jury in Bangert had not been instructed on this element, I cannot come up with a way that this court could have affirmed the convictions in Bangert. So I would say that the better rule here is that set forth in the LaPorta and the Fiola cases that are cited in our brief, which is that in this context, knowledge of ownership is not an element of the offense, that that distinguishes it, because destroying other people's property is mala in se, that that distinguishes it from situations such as Title 18 USC 1470, which is transmitting obscene material to a minor. The defendant must know that the person to whom they are sending the obscene material is a minor. Because, of course, sending even sexually explicit material between consenting adults is not a crime. And therefore, knowledge is needed in that sort of context. Turning, if I may, to the argument on the sufficiency of the evidence that Mr. In our brief, we catalog all the things, really, that the jury was told. And all the things that Mr. Aligata presented to this court this morning, he presented to the jury in this case in his final argument. Ms., I'm sorry. What about the lack of motive? That seems to be sort of a strong point for the defendant. That maybe if there's evidence on both sides that he couldn't act willfully because of his alcohol and intoxication, or maybe he could. But if you really look at why would this fellow, with everything on the line, do this? There's really just no reason why he would go and risk his future. Apparently no problems as an aviation student. Does that tip it the other way? I don't believe it does, Judge Kelly, no. And here's why. Much is made on the other side by the damage that was done to the car. But I believe it important to remember, and that's used to say, look, he crashed. He nearly got badly injured. He lost everything because, of course, the crashed car was found by law enforcement. But I think it's important to remember that the crashed car was caused not by the impact with the localizer antenna array. It was caused about 280 feet later when the car hit the ditch bordering Highview Avenue, which the officer testified, or it's a reasonable inference, excuse me, from the officer's testimony, was unanticipated because Mr. Krause was driving at such a speed that he was outrunning his headlights. He didn't see the ditch. Had that ditch not been there, he would have driven onto Highview Avenue, turned left, turned right, and gone on to his destination. So the harm, the physical harm, the legal harm that Mr. Krause was exposed to as a result of this incident is not a result of hitting the antenna array. And government exhibits one through 19, which are photographs of the array taken the morning after, and you can see the tire tracks because the dew is still on the grass. It comes off the end of that runway. It goes 270 feet. It hits that array smack in the middle, and then it continues dead straight for Mr. Nagel from the FAA testified that it was about 280 feet onwards to the road. It continues dead straight. I agree that I don't know why he did it, but it is not an element of the offense that we prove why he did it. It is an element of the offense that we prove that he did it and that he did it willfully, and that we did. But if he's out running his headlights, and I don't understand the array to have been lit up or have lights around it itself. I don't believe it did. There was no evidence of that. It seems to me that if he's out running his headlights and he's joyriding, he may just have hit that. As you sort of relay it, he may have been thinking, I'm going on to the next street, this has been fun. I got to go however fast, 100 miles an hour down the runway. He may have had no interest in intentionally destroying that antenna. It just happened to be in his way, because he just dead on hit it, and he was too drunk to veer off. And if the jury had come to that conclusion, I don't think that I would have an argument with what they did, and if I did, it wouldn't matter. But I don't think that that's an appropriate backwards look at what the jury in this particular case did. They had all that evidence. They also had the evidence that this, as you pointed out in questioning Mr. Aligata, this is not just a private pilot. It's an instrument rated private pilot. This machinery, this electronic array is something that he uses. This is an airport where he's practiced touch and go landings. It's about four miles from his house, and then phoning his mother, directing his mother to the scene by reference to a particular light, recognizing the distinctive pattern of headlights and running lights on his father's van, and knowing therefore that this is his mother approaching. With respect, I do not agree that the record shows that he passed out in the car on the ride home. His mother's testimony of the ride home is at pages 316 to 317, and it is that when he got home, he wanted to go to sleep, and she would not permit that. She wanted him to drink fluids. And then the other thing that I do want to say on the point of willfulness is Mr. Krause's, the defendant's mendacity. Because that was introduced in part for the classical reason of if the defendant is not telling the truth, he ought not to be believed. But it was mendacity of a particular sort. It was purposive, and it was goal-oriented. And let me, if I may, give the court one example. At trial, Mr. Krause was asked a series of questions. Do you remember where you were in the morning? Do you remember where you were in the afternoon? Do you remember where you drank the night before? And to the question, do you remember where you drank the night before? He said, no, he did not. However, he also testified that he had lied to the police. And interestingly, one of the lies he told to the police was, I wasn't drinking at this bowling alley in Lakeville, Minnesota. I was drinking at a buddy's house. And he gave the officer a landmark, a particular Chevrolet dealership, that the buddy's house was close to. He testified at trial that he had told that lie to the officer in order to protect the bowling alley, because his grandparents lived across the street from it. He'd visited there many times. He felt he needed to protect them. But if he's saying at trial he doesn't remember where he was the night before, and if the only people he's interacted with between hitting the localizer antenna array and telling that lie to the police are his mother, the tow truck driver, and the police officer, then who told him where he had been the night before? And that's the sort of, as I say, purposive, goal-oriented, thoughtful lies that are indicative not just of a lack of credibility on the defendant's part, but also of an ability to commit a specific intent crime. Charles Krause was drunk when he hit that antenna array. Nobody argued one word to the contrary in that trial. But as I said in closing, and as I say again today, the record evidence shows, and the jury was entitled to conclude, and this court should affirm, using the well-known standard by which this court reviews a jury's verdict, that Charles Krause was not so drunk that he could not form the specific intent to do the crime of which he was committed. If there are any questions, I'm happy to respond. Otherwise, I will wrap up a minute early. Thank you all very much. Counsel? Minutes and 51 seconds. Thank you, Your Honor. Judge Strauss, I think you're correct that the canons of statutory construction provide that this particular statute, 1361, that the word willful modifies both the verb injure or injures, which is the relative, the relevant word here, and the property of the United States. I think that the statute, I mean, we can speculate about what Congress was thinking, but that the statute was intended to punish people who specifically knew they were damaging government property. Now, there are two problems with that theory. One is the one I identified and that opposing counsel talked about, which is the way willfully is defined. So it's a plain language thing. You usually carry it through that canon, you carry it through the mens rea, but it makes sense grammatically and syntactically. And here, attaching willfully to property of the United States doesn't make any sense. Willfully, property of the United States, that doesn't make any sense. Whereas, knowing that it's property of the United States would make sense. So that's your first problem. The second problem is this is a jurisdictional element or an attendant circumstance, and it's like at night in a burglary. You don't necessarily have to know it's at night, it just has to be at night. And so I'm wondering what your response is, sort of those two weaknesses in the argument are. Sure. Let me answer the jurisdictional fact part first. The only thing that I can say is this is not a particularly well-developed, there's not well-developed case law around this statute. There are certainly other federal statutes that have what we could call a jurisdictional fact. But the case law cited for that support, it deals with completely separate statutes, 641, an assault on a federal officer. And so while there are federal statutes that do it, I don't have an answer as to why this wasn't more clearly drafted as to that point. Which gets to your second point. Willfully, I concede that it doesn't syntactically agree with the rest of it. But the phrases are so close to each other in the statute. And again, the policy reasons why you would punish somebody for destroying government property without the knowledge that it's government property, perhaps it's jurisdictional, but it seems like there's a reason to do it. And Bangert, which is this circuit's case, I understand the argument that the jury instructions in Bangert didn't have this element in them. We should not let the tail wag the dog. The fact is, it was a sufficiency of the evidence case. And in three separate locations on the same page of the decision, this court said, for sufficiency of the evidence purposes, these defendants had to know that the flag was federal property. That is as clear as it can be. There's only one circuit decision in a separate circuit that disagrees. You're left, from a stare decisis point of view, with a case that directs you how to rule on this element. Let me make one final note about facts. Highview Road was at the end of the runway, and Mr. Dougherty crossed Mr. Krause. He had driven on Highview Road. And so the idea that he flipped over it shows an intoxicated state to the point where he is not guilty of the offense. Thank you. Thank you, counsel. Case is submitted, and you may stand aside. Take your seat. Thank you. All right, please call our next case. United States versus Brian Reichert. Mr. Morrison? Mr. Morrison, as we began, I noticed that you were appointed in this case. And I want you to know that the court appreciates your service in this capacity. It's a privilege, and I appreciate the appointment, Judge.